MARGARET L. ROE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Roe v. Commissioner
Docket Nos. 9918-83, 20902-83, 416-84, 2364-84, 17978-84.
United States Tax Court
T.C. Memo 1986-510; 1986 Tax Ct. Memo LEXIS 98; 52 T.C.M. (CCH) 778; T.C.M. (RIA) 86510; October 8, 1986. O. Jan Tyler and J. Duncan Webb, IV, for the petitioners. George E. Gasper, Deborah A. Butlerand Rebecca W. Wolfe, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Judge: These consolidated cases were assigned to and heard by Special Trial Judge Joan Seitz Pate pursuant to section 7456(d) and Rules 180, 181 and 183. [2] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. *101 OPINION OF THE SPECIAL TRIAL JUDGE PATE, Special Trial Judge: These cases involve the following deficiencies in income tax: Petitioner
Docket No.
Year
Deficiency
Margaret L. Roe
9918-83 1979
$2,055.88
Margaret L. Roe
19798-84
1980
1,994.00
Michael L. & Patricia A. Sincleair
20902-83
1979
8,097.10
Louis L. Young
416-84  1978
27,327.06
1979
15,078.15
1980
5,945.11
James & Teelaine Harvey
2364-84 1979
32,426.12
All of the issues arise from transactions between petitioners and Alpha Omega Publications, Inc. (hereinafter "Alpha Omega"). Petitioners claimed operating losses and investment credits attributable to franchises and video systems purchased from Alpha Omega. Respondent disallowed these losses and investment credits maintaining that: (1) petitioners did not have the requisite profit objective and, consequently, the losses are not deductible nor are the investment credits allowable; (2) these transactions were, in essence, non-interest bearing loans from petitioners to Alpha Omega; (3) the promissory notes executed by petitioners and payable to Alpha Omega did not represent genuine indebtedness and, therefore, *102 interest thereon is not deductible nor may the notes be considered for purposes of computing amortization, depreciation and the investment credits; and (4) the video systems were not placed in service during the taxable years at issue nor were the films primarily educational or entertaining in nature as required by section 1.48-8(a)(3) and (5) of the Income Tax Regulations, and therefore, depreciation and investment credits attributable thereto are not allowable. In summary, from 1978 through 1980, Alpha Omega sold franchises to various individuals, including petitioners, granting them the exclusive right to market Christian educational curriculum materials within specified geographical territories in the United States. In connection therewith, Alpha Omega's sales representatives offered their services to each of the franchisees to conduct a marketing program within each territory. The program was not successful. In 1983, Alpha Omega offered each franchisee the right to turn his franchise back to the company in return for (1) cancellation of the note representing the balance of his unpaid purchase price, and (2) installment payments of cash. Alpha Omega subsequently offered to *103 exchange each installment contract for its common stock. As of the date of trial, all but one of the franchises had been surrendered. [3]
Petitioners reported income and claimed deductions which in all years resulted in losses on Schedule C. In addition, all petitioners, but one, claimed investment credits on video systems acquired with their franchises. Respondent disallowed the deductions and the investment credits. FINDINGS OF FACT Background Alpha Omega was founded by Dr. Rudolph Moore in the summer of 1977, when he formed Educational Media Corporation. [4] He then engaged eight consultants, [5] charging them with developing a Christian educational curriculum to be marketed primarily to churches and private schools. During numerous meetings, these consultants designed a curriculum based on a series of individual student workbooks known as "LIFEPACs." Each LIFEPAC was designed specifically for personalized instruction based upon measurable progress. In other words, the student had to master the learning materials contained in each LIFEPAC before progressing to the next. The consultants also formulated the *104 basic parameters for developing each LIFEPAC and selecting the subject matter to be covered. Ten separate LIFEPACs were to be prepared for each subject for each year of study. That summer Dr. Moore and the consultants set the criteria for selecting LIFEPAC writers. Each writer had to meet three major qualifications; each had to be a "born-again" Christian, hold a degree in the subject matter he would cover, and have at least three years of experience teaching the subject at the grade level at which he would be writing. Over three hundred persons applied for these positions. Ultimately, approximately 250 authors actively participated in the project. The initial stage of the project, writing LIFEPACs for grades two through six, was completed by the spring of 1978. Later, LIFEPACs for the first *105 grade and grades seven through twelve were developed. The second stage of the project (grade 1 and grades 7 through 12), was patterned on the original project and was completed in the latter part of 1978. After a LIFEPAC was written, a consultant reviewed the material. It was then edited by Dr. Moore, and finally printed. It was a substantial undertaking. The average LIFEPAC is 50 pages long and there are ten LIFEPACs per grade level, hence, approximately 500 pages per subject per grade level had to be written. For the five basic subjects, this totaled approximately 2500 pages per grade level, which, for the initial stage, approximated 12,500 pages of material. [6]
*106 A catalog prepared and distributed by Alpha Omega described the LIFEPACs offered for sale as follows: The LIFEPAC series of study booklets is a complete developmental, academic, Christian curriculum.The LIFEPACs offer a curriculum based on Biblical truths and principles. The subjects of language, arts, mathematics, science, and social studies are viewed through a Biblical perspective to assure individual growth in the Christian life-view. A complete Bible course encourages Christian growth as each student studies God's Word. Including Bible as one of the academic basics makes the LIFEPAC series the most comprehensive Christian curriculum available -- with instruction leading to mental, social, and spiritual growth. * * * Other products offered by Alpha Omega included resource books, elective subjects, support materials, testing materials, spelling tapes and lists, supplies, promotional materials to be used with parents and church people, administrative materials, and training materials for administrators and teachers. Alpha Omega also offered materials and training to persons interested in starting their own Christian school. [7]
*107 To finance the development of the LIFEPACs, two limited partnerships were formed. The first, Alpha Omega Publications, Ltd. (hereinafter "AOP I"), raised $350,000 in the fall of 1977 to develop LIFEPACs for grades 2 through 6, and the second, Alpha Omega Publications, Ltd. (hereinafter "AOP II"), raised $645,000 in the spring of 1978 to develop the LIFEPACs for grades 1 and 7 through 12. Alpha Omega was the general partner in both partnerships. The first LIFEPACs were published in June of 1978, ready for the 1978-1979 academic year. Alpha Omega then established six training centers in which to train teachers in the use of its curriculum. By the fall of 1978 Alpha Omega was a going concern occupying 10,000 square feet of office and warehouse space, employing a staff of approximately 35 persons, including editors, typesetters, order processors, customer service representatives and warehouse staff. In addition, consultants and writers were retained as needed. The Franchise Program In the latter part of 1978 Alpha Omega required an infusion of capital to implement a full-scale marketing program. various alternatives were discussed, including requesting additional capital from *108 the limited partners of AOP I and AOP II; borrowing money from banks; issuing additional stock; and the franchise program. The franchise program had been proposed to several of Alpha Omega's Board members by John W. Duffell, III. [8] After due consideration, the Board decided to offer for sale franchises granting the right to sell Alpha Omega's products within certain geographical areas located within the United States. *109 The franchise program was established in the latter part of 1978. The United States was divided into five hundred geographical territories, each denominated by a zip code. Each territory contained an average of 330 churches. [9] By the end of the program, 214 individuals had purchased a total of 437 franchises. [10]
Each of the franchisees received an offering circular entitled "Alpha Omega Publications Presents a Franchise Investment for the Sale of Christian Curriculum" dated July 15, 1979 (hereinafter "1979 Offering Circular"). The 1979 Offering Circular described the transaction as the purchase of a video system [11] and a franchise [12]; related the history of AOP I, AOP II and Educational Media Corporation; listed the principals involved [13]; included financial information such as unaudited financial statements; *110 forecasted franchisee annual cash flow for the years 1979 through 1983 under various assumptions; and contained an extensive analysis dated December 15, 1978 describing the various tax aspects of the transaction. Also attached were forms for the license agreement, license promissory note, license security agreement, financial representation letter, and video system promissory note. [14]
*111 The Franchise Agreement granted each petitioner the right to market and sell LIFEPACs in specific zip code areas under the supervision of and in accordance with the standards approved by Alpha Omega. The franchisee was required to "vigorously" promote the marketing and sale of LIFEPACs, to maintain working capital and net worth sufficient to properly carry out these functions and to reflect favorably on Alpha Omega and the LIFEPAC curriculum. The franchisee was entitled to receive, as a commission, 20 percent of collections from orders placed in the first school year, by his new customers, and 6 percent thereafter. In addition, the franchisee was entitled to a 6 percent commission on all sales made by persons other than himself in the franchise territory. The term of the franchise was five years cancellable upon ten days notice in the event of default. The term was renewable for an additional five years at the "current fee for such extension and renewal in a like amount * * *." The total cost of the franchise was $40,000, payable $4,000 down with the balance payable by way of a recourse promissory note. [15] The note, in the amount of $36,000, plus interest at the rate of 7 *112 percent per annum from the date of the note until maturity, was payable in monthly installments commencing on the 10th day of the following calendar month. The amount of the monthly installment was the greater of 5 percent of the total commission due from sales of LIFEPACs or $100. The unpaid principal and all accrued interest were due and payable January 1, 1985. To assure performance by the franchisee, and to protect Alpha Omega in the event of default, insolvency, receivership, or bankruptcy of the franchisee, the note was secured by the franchise, as well as by a continuing interest in all inventory, acocunts receivable, contract rights, and other assets arising out of the business of selling LIFEPACs. In addition, the franchisees were required to purchase a video system consisting of a film strip and projector. [16] Each franchisee paid $1,000 down and signed a recourse note for the sum of $22,187, including all interest and carrying charges, payable at the rate of $369.79 per month. [17]
*113 Each franchisee was required to sign a statement acknowledging, among other things, that he was aware of the high degree of risk in the investment and that he had a net worth in excess of $200,000, exclusive of his home, furnishings, and automobiles, or that he had a net worth exceeding $50,000 and taxable income during the current calendar year subject to a marginal tax rate of at least 50 percent. In addition, the 1979 Offering Circular cautioned that the venture involved a high degree of risk and was suitable only for persons having substantial financial resources. It warned that the projected financial results were estimates only, that they were intended to facilitate the understanding of the transaction, and that no assurance could be given as to the actual amount of any return which would ultimately occur as a result of the transaction. It also warned that the projected tax benefits were based on current law and no assurance was given that the actual tax benefits were as projected. [18]
*114 The 1979 Offering Circular included the following two Annual Tax and Cash Flow Analysis projections (computed with and without "$4,000 bonus depreciation") for each of the franchises: ANNUAL TAX AND CASH FLOW ANALYSIS
WITHOUT
$4,000 BONUS DEPRECIATION
Tax Analysis
1979
1980
1981
1982
1983
Gross Sales
$30,000 $120,000 $180,000 $240,000 $300,000 Licensee Income
6,000 15,600 19,200 22,800 26,400 Operating Expenses: Franchise Deduction
8,000 8,000 8,000 8,000 8,000 Depreciation
3,312 5,679 4,056 2,897 2,069 Interest
1,047 2,391 2,032 1,430 569 $12,359 16,070 14,088 12,327 10,638 Net Profit (Loss)
(6,359)
(470)
5,112 10,473 15,762 Tax Savings (Cost)
Assuming 50% Bracket
3,180 235 (2,556)
(5,237)
(7,881)
ITC
1,875 Total Tax Savings (Cost)
5,055 235 (2,556)
(5,237)
(7,881)
Cash Flow Analysis
Tax Savings (Cost)
$5,055 235 (2,556)
(5,237)
(7,881)
Licensee Income
6,000 15,600 19,200 22,800 26,400 Note Payments: License
(5,500)
(6,000)
(9,000)
(12,000)
(15,000)
Equipment
(2,849)
(4,437)
(4,437)
(4,437)
(4,437)
Total Cash Flow
2,706 5,398 3,207 1,126 (918)
Cumulative Cash Flow
2,706 8,104 11,311 12,437 11,519 *115 Projections assume 10 new schools will be sold annually, with 100 students per school. ANNUAL TAX AND CASH FLOW ANALYSIS
WITH
$4,000 BONUS DEPRECIATION
Tax Analysis
1979
1980
1981
1982
1983
Gross Sales
$30,000 $120,000 $180,000 $240,000 $300,000 Licensee Income
6,000 15,600 19,200 22,800 26,400 Operating Expenses: Franchise Deduction
8,000 8,000 8,000 8,000 8,000 Depreciation
6,741 4,698 3,357 2,397 1,713 Interest
1,047 2,391 2,032 1,430 569 $15,788 15,089 13,389 11,827 10,282 Net Profit (Loss)
(9,788)
511 5,811 10,973 16,118 Tax Savings (Cost)
Assuming 50% Bracket
4,894 (256)
(2,906)
(5,487)
(8,059)
ITC
1,875 Total Tax Savings (Cost)
6,769 (256)
(2,906)
(5,487)
(8,059)
Cash Flow Analysis
Tax Savings (Cost)
6,769 (256)
(2,906)
(5,487)
(8,059)
Licensee Income
6,000 15,600 19,200 22,800 26,400 Note Payments: License
(5,500)
(6,000)
(9,000)
(12,000)
(15,000)
Equipment
(2,849)
(4,437)
(4,437)
(4,437)
(4,437)
Total Cash Flow
4,420 4,907 2,857 876 (1,096)
Cumulative Cash Flow
4,420 9,327 12,184 13,060 11,964 *116 Projections assume 10 new schools will be sold annually, with 100 students per school. Each franchisee also entered into a "Letter Agreement" [19] requiring him to perform certain duties in his franchise territory, including mailing advertising and informing Alpha Omega of leads developed thereby. For these services, Alpha Omega agreed to pay the franchisee $1,165 per month [20] less any amount due Alpha Omega. [21] This resulted in a cash payment to the franchisee of approximately $82 per month.The Letter Agreement contained a cancellation clause providing that it could be terminated by either party upon thirty days written notice. [22]
*117 Payments to the franchisees under the Letter Agreements ceased in March 1981 and the Letter Agreements were canceled on September 30, 1982. None of the petitioners ever personally performed any of the services called for in the Letter Agreements, nor did they make any payments on the notes following cancellation. An updated offering circular dated July 15, 1980 (hereinafter "1980 Offering Circular") was also distributed. The 1980 Offering Circular basically restated the language of the 1979 Offering Circular but included certain additional information. Most notable was the attachment of an audited financial statement of Alpha Omega reflecting sales for the fiscal year ended June 30, 1980 of $1,370,643 and overall net earnings of $38,986 which included net franchise income of $542,799. Notes to financial statements included the following information regarding the franchises: At June 30, 1979, a total of 136 franchises had been sold and at June 30, 1980, a total of 340 had been sold.Down payments were either collected or in the hands of the franchise agent. * * * The following is an analysis of cash flow assuming no sales in the territory: Per Unit
1979
Year of Sale
1978
and Later
Down payment
$5,000 $5,000 Agent commission
(750)
(750)
Equipment
(380)
(380)
Net to Company
$3,870 $3,870 Following Years
Note payments
$ 977 1,083 Guaranteed commission
(1,060)
(1,165)
Cash Outlay By Company
$ (83)
$ (82)
*118 Franchise holders are guaranteed a minimum sales commission for the term of the franchise contract and in an amount which exceeds the note payment. Alpha Omega Operations When it initially offered the franchise program in the fall of 1978, Alpha Omega had approximately 600 schools as customers. Its marketing program, which had started with eleven individuals, was, by the fall of 1979, being conducted by three individuals who had contracted with Alpha Omega to market LIFEPACs throughout the United States. [23] The contracts required each sales representative to meet certain sales quotas. To meet those quotas the sales representatives were expected to recruit and train salesmen, and institute other measures needed to reach those goals. In October 1980, all three sales representatives were terminated for failure to meet their quotas. Prior to their termination, however, these sales representatives had contacted each petitioner and agreed to perform all of the conditions of his Franchise Agreement, to promote the *119 franchise, sell LIFEPACs within his territory and to assume all financial obligations concerning advertising and sales promotion called for in the Letter Agreement. In return, each petitioner agreed that commissions from all sales initiated by the sales representative would be paid directly to the sales representatives. Each petitioner also agreed to make available the video system to be used exclusively in fulfilling these responsibilities. [24] This agreement was subject to termination by either party upon thirty (30) days written notice. Petitioners were never notified of Alpha Omega's termination of the sales representatives. Moreover, after such termination, Alpha Omega never required that petitioners render the services called for under the Letter Agreements either personally or through the appointment of new representatives. Following termination of the sales representatives, Alpha Omega decided that a strong effort should be made to increase the "awareness level" of potential customers by national advertising and other promotion. A marketing *120 firm in Tempe, Arizona, was engaged as a marketing consultant to develop a plan. Thereafter, marketing efforts were concentrated on the establishment of several training centers where customers and potential customers were presented with the LIFEPAC curriculum. Alpha Omega conducted all of these marketing efforts. The franchisees were neither informed nor consulted about marketing efforts within their territories. At the time of trial, Alpha Omega had approximately 2,000 customers, of which approximately 1,500 of them were considered nearly full users or relatively large buyers. Gross sales had reached approximately $2.2 million annually. The financial condition of Alpha Omega during the years in issue can best be described as precarious. Moreover, there was a great deal of turmoil within Alpha Omega's executive ranks caused by infighting among management, strife, personality conflicts and financial pressure. It culminated in the termination of the services of the founder, Dr. Rudolph Moore, early in 1980. Dr. Ray Miller, one of the sales representatives, became the chief executive officer but was quickly terminated in the fall of 1980. At the end of each year, each franchisee *121 received a report, broken down by franchise, of the gross sales in his territory, total "commission" income per the Letter Agreement and the total amount offset against such commissions, including the interest paid on each note. As compared with the financial projections made in the 1979 Offering Circular, the sales in each of petitioners' territories were meager at best. Alpha Omega issued unaudited financial statements for the year ending December 31, 1981, reflecting its view of these transactions. "Franchise notes receivable" were shown on the balance sheet in excess of 15 and a half million dollars; curriculum revenue climbed to in excess of two million dollars; and earnings from operations before taking out the franchise expense or provisions for income taxes amounted to $186,512.After allowance of franchise expense, interest expense and a refund of income taxes, the loss totaled $260,104. Notes to the financial statements disclosed that management had discontinued the sale of new franchises during 1981 but that a total of 442 franchises had been sold to date. [25] Inventory of curriculum materials totaled $1,363,479. *122 Alpha Omega also prepared unaudited financial statements as of December 31, 1982. No accounts receivable from franchisees were shown. Notes to these financial statements explained that: The franchise holders were guaranteed minimum commissions on a month-to-month basis. Commission payments were suspended after the March 1981 payment, and terminated permanently on Sept. 30, 1982. No effort has been made to enforce collection on the notes due from franchisees. The current balance on the notes exceeds $13,000,000, pending the outcome of the Internal Revenue Service appeal and a proposed exchange of franchises. Operating statements for the six months ending December 31, 1982, showed that curriculum revenue had risen to $1,381,138; that earnings before the franchise program was taken into account amounted to $315,358; and that after deducting the franchise program cost of $272,183 there were net earnings for the six month period of $43,175. The notes to the financial statements explained that: Guaranteed commissions due on the franchise program in the amount of $736,292 has been reported as non-current during the current period. The company intends to settle the obligation *123 using non-current assets where possible or may consider alternative methods of settlement including a long term pay out. The trade-off is non-enforcement of the notes receivable due on the franchise program. In 1983, Alpha Omega proposed to terminate all franchises and in return, to cancel all debts due the company by the franchisees and to pay each franchisee approximately $1,647 in 20 equal monthly installments, commencing July 15, 1984. The company stated that the total amount due to all franchisees, if they should agree to terminate, would be approximately $684,236. This amount approximated the payments under the Letter Agreements, accrued by Alpha Omega between March, 1981, and October, 1982, net of payments on notes due from the franchisees. As of September 30, 1983, 179 franchisees owning 347 territories had elected to sign the franchise termination agreement and 23 franchisees owning 83 territories had not. Finally, on February 23, 1984, following meetings with the franchisees and extensive negotiations with various shareholders and interested parties, Alpha Omega proposed a reorganization which included exchanging 30 percent of its stock to the 202 franchisees in return *124 for cancellation of its indebtedness to the franchisees under the franchise termination agreements. In this connection, the Alpha Omega Publications, Inc. [26] Offering Circular dated February 23, 1984 (hereinafter "AOP Offering Circular") was distributed to former and existing franchisees. After explaining that it had agreed with most of the franchisees to terminate their franchise agreements, Alpha Omega proposed to exchange 56,000 [27] shares of its capital stock at $12.22 per share in return for cancellation of its indebtedness to the franchisee. If any of the former franchisees did not accept stock, Alpha Omega agreed to abide by the terms of the franchise termination agreement. *125 The Petitioners Petitioner - Margaret L. Roe
During the years in issue, Margaret L. Roe was employed and, for approximately twenty-five years, had been employed as a flight attendant for a major airline. She resided in Hialeah, Florida at the time both her petitions were filed. She was single and of modest means. Her net worth, comprised primarily of the equity in her home and automobile, was under $50,000. She was seeking income to supplement her wages to provide funds for later retirement. Because her income was not substantial, she sought to maximize her income and was relatively unconcerned with the tax advantages of her investment. Petitioner first learned of the Alpha Omega franchise from her sister and brother-in-law. At a sales presentation, she was told that the franchise would produce income of over $50,000 during its five-year life. Although petitioner held a degree in secondary education, she was unfamiliar with the market for school curriculum materials. However, based on the aforementioned sales presentation, a consultation with her CPA, and encouragement from her sister and brother-in-law, she purchased one franchise (Dayton, Ohio) during 1979 and *126 another franchise (St. Cloud, Minnesota) in 1980. Petitioner did not intend to actively participate in developing her franchises. Rather, she contracted with the Alpha Omega sales representatives permitting them to sell within her territories.She was not aware that no particular sales representative was working her territory after they were terminated in 1980. Moreover, petitioner never viewed nor separately evaluated the video system because she believed that the system was necessary to the operation of the franchise. Although petitioner thought that she was liable on the notes signed by her in connection with these transactions, she believed that she would never be called upon to make the payments. Rather, she viewed the transaction as one that would return a minimum of $82 a month, with the possibility that it would earn the $50,000 in profits represented during the sales presentation. After cancellation of the Letter Agreement, no attempt was made to collect the balances due on the notes from her.In 1984, she surrendered her franchises in return for cancellation of her notes and installment payments of cash. Putitioners - James and Teelaine Harvey
James Harvey *127 and Teelaine Harvey are husband and wife and filed a joint return for 1979. During all times relevant to this litigation, they resided in Denton, Texas, where James Harvey was a practicing physician. Despite his substantial income, James Harvey was unsatisfied with his financial condition. Consequently, he asked friends whom he considered financially successful to recommend a C.P.A. and financial advisor who could assist him in establishing a long range plan for increasing his net worth including a retirement program. Prior to the transaction at issue, petitioner had made only a limited number of investments. He had purchased some stock, recommended to him by his brother, and made an investment in a nursing home, an enterprise in line with his expertise. Petitioner first learned of the Alpha Omega franchise from his new CPA, [28] who recommended this investment because, in his opinion, the public school system was in a state of turmoil and parents were seeking alternative ways to educate their children. His accountant led petitioner to believe that the Letter Agreement guaranteed a return of his initial investment, although he thought that he had personal liability on the notes *128 that he signed. After reviewing the tax implications of the transaction with his accountant, he felt that the tax deferment features of the investment would enhance its profitability. He did not investigate in any depth the representations made in the 1979 Offering Circular but relied upon his accountant's recommendations. Petitioner purchased four franchises during 1979, three in Chattanooga, Tennessee and one in Meridian, Mississippi. As a full-time physician, petitioner never intended to personally develop his franchises. He intended to, and did, use Alpha Omega's sales representatives, although he never knew which sales representatives were operating in his territory.Petitioner never attempted to value the video system, nor did he see the video system during the years in issue. After cancellation of the Letter Agreement, no attempt was made to collect the balances due on the notes from petitioner. He finally surrendered his franchises in return for the cancellation of his notes and Alpha Omega common stock. Petitioners - Michael L. and Patricia A. Sincleair
Michael L. Sincleair *129 and Patricia A. Sincleair are husband and wife and filed a joint return for 1979. They resided in Dallas, Texas when their petition was filed. [29] Michael L. Sincleair has an extensive business background. His education includes electrical engineering, marketing, management, banking and business law. He has worked with an insurance company in sales and computer operations, with Litton Industries running its automated business group, and has held management positions with Tektronix, Memorex Corporation and International Power Machines. In 1979, petitioner's salary exceeded $80,000. At the time of trial, petitioner was president of Triad Power Systems. Petitioner first learned of the Alpha Omega franchise from a co-worker at Memorex and attended a sales presentation which included several other Memorex executives (hereinafter "Memorex group"). Part of the discussion at the sales presentation *130 focused on the sales representatives with whom Alpha Omega had contracted to market their materials.Based on 300 prospects per franchise, the Memorex group considered the projection of ten sales per year reasonable and the marketing program feasible. After that meeting, the Memorex group sent a representative to the Alpha Omega office in Tempe, Arizona to evaluate the company's operations. He found Alpha Omega to be a going operation, with sales, employees, inventory, office and warehouse space. [30]
*131 In addition, the Memorex group enlisted a teacher and a school administrator to critique the LIFEPAC curriculum. They reported that it was "drill and practice" type material which was "a very in vogue method of teaching" at the time. Based on the Memorex group's evaluation of the transaction, petitioner believed that he would have minimum exposure to debt and, at the end of five years, would own a business generating a substantial cash flow. Petitioner considered the term of the franchise as indefinite because it was renewable at his option. Although he thought that he was fully liable on the notes, he did not consider that fact burdensome. Because petitioner viewed the equipment and the franchise as one package, he did not make an independent evaluation of the video system. Petitioner purchased one unit in 1979 (Charlottesville, Virginia) and another in 1980 (Westchester, New York). At the time he made his investments, he felt that he would have a "cash positive position" in Alpha Omega in the near future. Petitioner never planned to actively promote his franchises. He neither attended training sessions in Tempe nor received the video system.He entrusted that job to the *132 Alpha Omega sales representatives. After the Letter Agreements were canceled, petitioner did not make any payments to Alpha Omega on the notes, nor did Alpha Omega contact him regarding his failure to make the payments. He finally surrendered his franchises in return for cancellation of his notes and installment payments of $1,647 cash. Petitioner - Louis L. Young
Petitioner resided in Hot Springs, Arkansas at the time his petition was filed. [31] During the years in issue and up to the time of trial, Louis L. Young was a manufacturer's representative of women's apparel. He traveled extensively, approximately ten to eleven months per year. His territory consisted of Arkansas, Mississippi, Tennessee, and Louisiana.He had gross income from commissions in the six figure range during each of the years in issue and substantial net income after deducting all his outside salesman expenses. Prior to his investment in Alpha Omega, petitioner had invested in cable television, computer equipment leasing and in oil ventures. All of his investments were designed to maximize his income so that he could eventually "get off the road." At no time did petitioner personally promote *133 sales, but at all times expected that Alpha Omega representatives would market the product in his territories. Petitioner first learned of the Alpha Omega franchise from Hassell, his investment advisor.Petitioner believed that the franchises had a chance to succeed because the commission rate was high and private schools were growing in popularity. Except for presenting some of the LIFEPACs to a school superintendent and a schoolteacher for evaluation (who said that the "curriculum looked great"), petitioner did little to personally investigate Alpha Omega prior to making his investment. In fact, although petitioner received copies of the offering circular and other materials prior to the time of the investment, he believed that the franchises were of indefinite duration. Further, he did not inspect the video system before purchase. Petitioner purchased three Alpha Omega franchises in 1978, three more in 1979 and three more in 1980 for a total of nine franchises. At trial, he was unable to name all of the geographical areas covered by the franchises, but *134 it is clear that none of them were located within the territory which he traveled in the course of his occupation. He thought that he was personally liable on the promissory notes, but he made subsequent investments in 1979 and 1980 because he was receiving checks on his first investment regularly. Petitioner became concerned when the payments on his franchises stopped.He discussed the situation with his CPA/Attorney. After extensive negotiations, extending over a period of several months, petitioner finally surrendered his franchises in January of 1985 in exchange for cancellation of the balance of his notes and $18,000 cash. Prior to this settlement, however, Alpha Omega sued petitioner for payment of his notes, although petitioner was unaware that the suit had been filed. Expert Witnesses Respondent submitted the testimony of two expert witnesses at the trial of this case. The first testified as to the value of the video system, and the other as to the value of the franchises. Petitioners did not present any expert testimony as to any of the issues. OPINION As stated earlier (see page 2-3, supra), the issues for our determination are: (1) whether petitioners had *135 the requisite profit objective for their losses to be deductible and the investment credits allowable; (2) whether these transactions were, in essence, non-interest bearing loans to Alpha Omega; (3) whether the promissory notes of the franchisees to Alpha Omega represented genuine indebtedness; and (4) whether, aside from the question of profit objective, petitioners are entitled to deduct depreciation and claim an investment credit on their video systems. Issue No. 1 Objective of Profit Respondent first contends that the losses and the investment credits claimed by petitioners are not allowable under the provisions of section 183. In general, section 183 provides that if an individual engages in an activity, and such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except to the extent the activity produces gross income. The test for determining whether an activity is engaged in for profit under section 183 is whether the individual engaged in the activity with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). *136 The taxpayer's expectation need not be a reasonable one, but he must have a good faith objective of profit. Sec. 1.183-2(a), Income Tax Regs.; Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980). The taxpayer's profit objective must be his primary purpose and intention for engaging in the activity. Surloff v. Commissioner,81 T.C. 210, 233 (1983); Golanty v. Commissioner,72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). "Primary" means "of first importance or principally." Finoli v. Commissioner,86 T.C. 697, 722 (1986); Jefferson v. Commissioner,50 T.C. 963 (1968), citing Malat v. Riddell,383 U.S. 569, 572 (1966). Further, in this context, and, at least as a threshold matter, "profit" means economic profit, independent of tax savings. Surloff v. Commissioner,supra at 233; see Estate of Baron v. Commissioner,83 T.C. 542, 557 (1984), affd. 789 F.2d 65 (1986). *137 The determination of whether a profit objective exists is to be resolved on the basis of all of the surrounding facts and circumstances. Sec. 1.183-2(b), Income Tax Regs.; Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner,supra at 426. In our consideration, greater weight must be placed on objective facts than upon mere statements of intent. Sec. 1.183-2(a), Income Tax Regs.; see Beck v. Commissioner,85 T.C. 557, 570 (1985). Petitioners bear the burden of proving that their activities were engaged in with the requisite objective. Welch v. Helvering,290 U.S. 111 (1933); Sutton v. Commissioner,84 T.C. 210, 221 (1985), affd. per curiam 788 F.2d 695 (11th Cir. 1986). The regulations set out nine relevant factors to be considered, among others, in determining whether an activity is engaged in for profit.Briefly, these factors include: (1) the manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended *138 by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether the elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. No one factor is controlling but rather it is an evaluation of all the facts and circumstances of the case, taken as a whole, which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner,86 T.C. 360, 371 (1986); Golanty v. Commissioner,supra at 426. A careful review of the record shows that, at the time petitioners entered into this transaction, they found that Alpha Omega was a going bona fide business concern. It had wide-spread operations, a substantial inventory, highly educated and experienced personnel, and an extensive physical plant. Most importantly, it had developed what appeared to be a saleable product at great expense *139 by consultants highly regarded in the educational field. The amounts raised by AOP I and AOP II and expended for product development had equaled almost one million dollars. However, petitioners also realized that Alpha Omega was a relatively new operation and, consequently, had all of the attendant risks of a newly organized business. Dr. Moore's goal of developing Christian educational materials and marketing such materials throughout the United States was an ambitious project. The founders simply underestimated the capital which would be needed to finance product development and start-up expenses. They also underestimated the lead time and attendant expenditures necessary to develop a market for the LIFEPACs. As a result, Alpha Omega desperately needed capital by the fall of 1978. In an attempt to solve its problems, Alpha Omega embarked upon its franchise program as a quick way to raise immediate capital. Further, under the rights granted to each franchisee, the program could have been used to develop an extensive marketing network at little cost. However, it did not achieve that objective due to the way the franchises were promoted and sold. In evaluating the facts *140 as a whole to determine petitioners' objectives, [32] we are immediately struck by the substantial differences between the transaction described in the documents and the transaction as viewed by the petitioners. Most importantly, the documents clearly contemplated that the franchisees would actively participate in marketing, promoting and selling the product. In addition to the documents specifically stating this fact (i.e., the Letter Agreement required the franchisee to advertise and promote the product), the rate used in the cash flow analysis for determining gross commissions was based on the franchisee personally making the sales in his territory, rather than the lower rate applicable to sales made by Alpha Omega sales representatives. *141 On the other hand, petitioners never contemplated actively operating their franchises. At the time of purchasing their franchises, petitioners were all deeply involved in their careers and had been so for a long period of time. Petitioner Margaret L. Roe had been actively employed as an airline attendant for twenty five years. All of the other petitioners had substantial earnings from their current employment. They could not, under any reasonable scenario, improve those earnings by leaving their careers to promote their franchises. In addition, each of them testified that they had no intention of actively pursuing their franchises and that they believed that Alpha Omega's sales representatives would carry on the sales operations for them. Moreover, none of the petitioners had any expertise in the educational materials market. None of them bothered to determine how many potential customers were located in the territories they picked. [33] None of the petitioners attempted to determine the price of the LIFEPACs, the level of sales required to make a profit, or what expenses were necessary to generate such income. None of the petitioners could explain how Alpha Omega arrived at *142 the estimated commission income shown in the 1979 Offering Circular or whether they thought it was a reasonable amount. Respondent argues that these facts indicate that petitioners lacked a profit motive. We think that they indicate only that petitioners simply had no intention of actively running their own franchises. This determination, however, does not dispose of the issue. Nothing in section 183 requires active participation in an enterprise on the part of the taxpayer. Moreover, for the purpose of that section, it is immaterial whether the claimed deductions are those incurred in carrying on a trade or business or in the production of income under section 212. Sec. 1.183-2(a), Income Tax Regs.; Capek v. Commissioner,86 T.C. 14, 36 (1986); Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). See also sections 165(c)(2) and 167(a)(2). We believe that petitioners viewed their transactions with Alpha Omega as having very little downside risk.Basically, petitioners were asked to put up $5,000 cash. From *143 the outset, they were promised a net return of 60 monthly payments of approximately $82 each or a total of almost $5,000. Therefore, they really had little cash to lose. Concedely, petitioners were required to sign recourse notes totaling approximately $58,000 each for franchises acquired after December 31, 1978. But, even though petitioners may have thought that these notes carried with them full legal liability, we are satisfied that they never honestly expected that they would have to make the payments. [34] Further, Alpha Omega never made any realistic attempt to collect the notes.It was only after some of the franchisees would not accept Alpha Omega's plan for terminating the franchise program that the company threatened collection action.[35] We believe that Alpha Omega made these collection efforts primarily to "motivate" the remaining franchisees to agree to terminate their franchises and only incidentally to attempt to collect the unpaid balances. Finally, the minimal collection efforts by Alpha Omega were made after respondent's audit of petitioners had started. Cf. Porreca v. Commissioner,86 T.C. 821, 840 (1986). *144 In evaluating the potential profitability of the franchises, petitioners realized the inherent risk of their investments. Alpha Omega was new and the product relatively unknown.Moreover, the 1979 Offering Circular warned of the risk involved and petitioners were required to sign a statement affirming that they had substantial net worth or were recipients of a high income. Nevertheless, petitioners also believed that there was a chance of generating commissions over and above the amount of the note payments. They perceived that the quality of education in the public school system was deteriorating, that parents were seeking alternatives for their children's education, and as a result the market in Christian curriculum materials was growing. The possibility existed for rapid expansion of this market. Further, their franchises were renewable beyond the five year term. If sales expanded rapidly, substantial commissions may have been produced, and despite the fact that their franchises called for a renewal fee (unspecified in amount), this could have resulted in the value of the franchises appreciating over the long term. Respondent argues that the projected sales contained in *145 the 1979 Offering Circular were wildly optimistic. He reasons that, based on 500 franchises with projected sales of $60,000 per franchise in the first year and $300,000 per franchise in the fifth year, gross sales of $30 million in the first year and $150 million in the fifty year would have had to have been generated for all 500 franchises to succeed. We agree that these sales projections are unrealistic when viewed on an overall basis. Indeed, Alpha Omega itself never projected that its sales would ever approach anything close to those levels during the years in issue. Respondent's argument is based on the assumption that all 500 franchises would be profitable. However, petitioners were not acquiring all 500 franchises, but rather one or more particular franchises. To be profitable, each petitioner only needed to generate commissions in excess of his cash and note payments. [36] We find that petitioners actually and honestly believed this to be possible at the time they acquired their franchises. Respondent also *146 argues that petitioners' primary objective with Alpha Omega was to obtain the tax benefits. The primary purpose for entering into a transaction may not be for its tax advantages. See Capek v. Commissioner,86 T.C. at 36-37; Herrick v. Commissioner,85 T.C. 237, 255 (1985). Nevertheless, tax benefits, in and of themselves, do not negate the profit motive of a business or financial transaction. Wildman v. Commissioner,78 T.C. 943, 954 (1982); Lemmen v. Commissioner,77 T.C. at 1345-1346; Hager v. Commissioner,76 T.C. 759, 785 (1981). See Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1244 (1981). The 1979 Offering Circular projected a moderate amount of tax benefits for the first year.When considered over and above the monthly return, they certainly "sweetened the pot". However, these same projections showed that income tax would have to be paid in the second through the fifth year if "bonus depreciation" were claimed in the first year. [37] Therefore, the tax benefits from excess deductions disappeared after only one tax year. These benefits were just too insignificant *147 and too short lived for us to find that petitioners' primary objective was to obtain these tax benefits rather than to make a profit. [38]
Our determination ultimately rests upon the good-faith of petitioners' objective in entering into this venture. We have already found that petitioners viewed their transactions with Alpha Omega as offering a real potential for generating profit aside from tax considerations. [39] As is often the case, they did not have much expertise with which to make an independent evaluation of the commercial feasibility of their franchise. They did consult others but we have our doubts as to whether those consulted had the competence to make such an evaluation upon which the franchise depended. Therefore, petitioners either *148 believed Alpha Omega's financial projections or they did not. If they believed them, their profit objective is obvious, as the projections show substantial cash distributions, and we have determined that, as to each petitioner, these projections were not so unreasonable as not to be worthy of acceptance. Given the petitioners' perception of public education at the time, they believed that their limited downside risk justified the gamble for substantial profits. The fact that this venture was speculative and that petitioners' expectation of a profit may not have been reasonable does not obviate our finding. Section 1.183-2(a), Income Tax Regs. See Siegel v. Commissioner,78 T.C. 659, 704 (1982). Consequently, we hold that petitioners had an actual and honest objective of profit under section 183 when they purchased their Alpha Omega franchises and video systems. *149 Issue No. 2 Non-Interest Bearing Loan Alternatively, respondent maintains that acquisition of the franchise and video system was "in essence" a financing transaction between petitioners and Alpha Omega because that amount would be returned to the franchisee under the Letter Agreement.[40] In particular, respondent contends that, by virtue of the monthly payments promised petitioners under the Letter Agreements, they would not be required to pay the notes and would receive a monthly cash payment which, over a five year period, would reimburse them for their $5,000 cash downpayment. Petitioners maintain that the substance of the transaction followed its form, that Alpha Omega sold them franchises, and that respondent has ignored the duties and risks assumed by petitioners in his assessment of the transaction. Petitioners cite Frank Lyon Co. v. United States,435 U.S. 561 (1978) and Hart Schaffner & Marx v. Commissioner,T.C. Memo. 1982-348, in support of their position.
*150 It is well established that the economic substance of a transaction, rather than its form, controls for federal tax purposes. Commissioner v. Court Holding Co.,324 U.S. 331 (1945); Helvering v. Clifford,309 U.S. 331 (1940); Gregory v. Helvering,293 U.S. 465 (1935); Grodt & McKay Relty, Inc. v. Commissioner,77 T.C. 1221 (1981). The doctrine of substance over form is concerned with economic realities, and the formal written documents do not control when they conflict with the economic consequences of the transaction. Commissioner v. P.G. Lake, Inc.,356 U.S. 260, 266-267 (1958); Commissioner v. Tower,327 U.S. 280, 291 (1946); Helvering v. Lazarus & Co.,308 U.S. 252, 255 (1939). In a loan transaction, both parties must intend to create a debtor-creditor relationship. Electric & Neon, Inc. v. Commissioner,56 T.C. 1324, 1339 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974). This relationship is created when there exists an intent by both parties, contemporaneous to the time the "loan" is made, to establish *151 an unconditional, legally enforceable obligation to repay a principal sum. Professional Services v. Commissioner,79 T.C. 888, 915 (1982); Estate of Franklin v. Commissioner,64 T.C. 752, 761 (1975), affd. 544 F.2d 1045 (9th Cir. 1976); Howlett v. Commissioner,56 T.C. 951, 960 (1971); Delta Plastics Corp. v. Commissioner,54 T.C. 1287, 1291 (1970). Where the decision to repay rests in the discretion of the one who received the loan, a debt is not created for tax purposes. Zimmerman v. United States,318 F.2d 611, 612-613 (9th Cir. 1963). In our analysis, we cannot disregard, as urged by respondent, the cancellation clause contained in the Letter Agreements. [41] Although, neither party contemplated exercising this clause, Alpha Omega could discontinue payments at any time. Moreover, although Alpha Omega's officers acknowledged a "moral" commitment to make all of the payments, they (or any successor in interest to the notes) had the power to decide how much, if any, of the payments would be made. [42] Further, in view of Alpha Omega's rather poor financial condition, the financial *152 incentives to cancel the Letter Agreements increased as time passed. In fact, the Letter Agreements were canceled and the monthly payments discontinued before petitioners received full repayment of their $5,000. *153 In Frank Lyon & Co. v. United States,supra, a case relied on by petitioners, the Supreme Court upheld the form of a contract where the contract had economic substance and was compelled by business realities. If we look to the many rights and duties attendant to the franchise herein, we are satisfied that it had economic substance. The franchisees had the right to promote the business extensively, to advertise, hire personnel and take all actions necessary to actively sell the product within their territories.Those activities, if the petitioners had chosen to engage in them, could have resulted in their receiving substantially more income than called for in the Letter Agreements. From Alpha Omega's point of view, the transaction was also dictated by business realities. It was in the market for capital and selling franchises offered a means of raising that capital rather inexpensively. The cash payments by the franchisees promised to provide that capital. Although Alpha Omega contracted to make monthly payments to the franchisees, which might have offset that infusion of capital from the cash payment, it could have and in fact eventually did improve its *154 position simply by canceling the Letter Agreements. In addition, neither party intended the transaction to be a loan. In each of its financial statements, Alpha Omega reflected the sales of its franchises and recognized the gain realized therefrom. The payments called for in the Letter Agreements were shown as guaranteed minimum commissions on Alpha Omega's operating statements. We believe that these financial statements accurately reflect Alpha Omega's intent. As stated in Frank Lyon & Co. v. United States,435 U.S. at 577: Accounting methods or descriptions, without more, do not lend substance to that which has no substance. But in this case accepted accounting methods, as understood by the several parties to the respective agreements and as applied to the transaction by others, gave the transaction a meaningful character consonant with the form it was given. * * * [Fn. ref. omitted.] Finally, adopting respondent's position would require us to find that petitioners made non-interest bearing loans to Alpha Omega. The record does not disclose any reason why petitioners would have made such loans nor does respondent propose any. [43] Certainly, given *155 the time value of money, there was no financial incentive present here, and there was no showing that petitioners had any altruistic, religious, educational or charitable motivation. [44] In fact, the evidence produced shows that petitioners had an arm's-length business relationship with Alpha Omega. *156 Accordingly, based on the totality of circumstances here present and for the reasons heretofore stated, we find and hold that petitioners did not make non-interest bearing loans to Alpha Omega. Issue No. 3 Genuine Indebtedness Next we must determine whether the promissory notes for the franchise and the video system represented a genuine indebtedness on the part of petitioners to pay such amounts to Alpha Omega. Respondent maintains that these amounts should not be taken into account in determining petitioners' deductions for interest on the notes, amortization of the franchise, depreciation on the video system, and investment credit on the video system, because the notes do not represent genuine indebtedness. Alternatively, he maintains that section 465 limits deductions of any losses to the amount with which taxpayer is at risk and that section 465(b)(4) precludes petitioners from considering the notes in the at-risk computation. On the other hand, petitioners maintain that the notes represent genuine indebtedness to be included in the basis of their property. They reason that since they were required to pay the indebtedness in full, regardless of the value of the franchise *157 and video system, their total risk equaled the cash down payment and the amount of the indebtedness that must be paid in the future. As to respondent's argument under section 465, petitioners object to the Court's consideration of this issue because respondent first raised it after trial. In addition, petitioners claim that section 465 is not applicable to this case. Generally, the question of whether indebtedness is genuine arises in two contexts, both of which are present in this case. First, it arises in determining whether the indebtedness may be added to the basis of property acquired for purposes of computing depreciation, amortization and the investment credit. Generally, the basis for computing amortization, depreciation and the investment credit is the cost of the underlying property. See sections 38, 46, 167 and 1012. "Cost" is the amount paid for the property in cash or other property. Sec. 1.1012-1(a), Income Tax Regs. A promissory note is generally included in such cost. Crane v. Commissioner,331 U.S. 1 (1947); see Commissioner v. Tufts,461 U.S. 300 (1983). However, depreciation and amortization deductions are allowed to an *158 owner of property [45] to recognize the economic loss attributable to the property's deterioration through exhaustion, wear and tear, and obsolescence. Estate of Franklin v. Commissioner,64 T.C. 752, 761 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). Consequently, they are based on the actual expenditures for the property. Narver v. Commissioner,75 T.C. 53, 98 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Mayerson v. Commissioner,47 T.C. 340, 350 (1966).Therefore, to be included as part of an amount paid for property, the promissory note must reflect a genuine debt. Estate of Franklin v. Commissioner, 544 F.2d at 1049; Odend'hal v. Commissioner,80 T.C. 588, 604-605 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984), cert. denied 471 U.S.     (1985).
Second, the question of whether indebtedness is genuine arises in determining the deductibility of interest paid on such indebtedness. In general, *159 section 163(a) allows a deduction for interest paid. To be deductible, however, the underlying debt must be genuine. Elliott v. Commissioner,84 T.C. 227, 244-246 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. per curiam 448 F.2d 1268 (9th Cir. 1971), cert. denied 405 U.S. 1016 (1972). When a debt is incurred solely to create an income tax deduction, it does not support an interest deduction. Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965), cert. denied 385 U.S. 1005 (1967). In the seminal case in this area, Knetsch v. United States,364 U.S. 361 (1960), the Supreme Court considered the deductibility of interest paid on nonrecourse loans an insurance company made to the taxpayer to purchase single premium annuity savings bonds. After paying the premiums, using mostly nonrecourse notes, the taxpayer borrowed back the increase in cash value and used such proceeds to pay advance interest on the loan. The Court found that the taxpayer *160 borrowed back, in reality, a substantial part of his "interest" payments, the difference being retained by the insurance company as its fee for providing the ruse of "loans." It held that the transaction was entered into for the sole purpose of reducing taxes and lacked economic or commercial substance. Therefore, it was a sham and without effect for federal income tax purposes.[46] The decision in Knetsch has been followed by a myriad of cases denying a deduction for interest on indebtedness after holding the transaction was a sham. See, e.g., Falsetti v. Commissioner,85 T.C. 332 (1985); Karme v. Commissioner,73 T.C. 1163 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Lovett v. Commissioner,37 T.C. 317 (1961). The sham transaction theory is broader *161 in scope than an analysis of whether a debt is properly includible in basis. Cf. Siegel v. Commissioner,78 T.C. 659 (1982). Rather, its focus is on the entire transaction. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). To be classified as a sham the transaction must have "no business purpose" and "no economic substance." See Rice's Toyota World v. Commissioner,752 F.2d at 91. The "business purpose" test is a subjective one and, essentially, is based upon the intent of the parties. Packard v. Commissioner,85 T.C. 397, 417 (1985). Similarly, transactions devoid of economic substance are not shams where a taxpayer mistakenly believes a potential for profit exists. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 203 n. 17.Having already found that petitioners had a profit objective and that Alpha Omega entered into this transaction to raise additional working capital, it follows that this entire transaction cannot *162 properly be classified as a sham. However, in a case where only portions of the transaction have economic substance, those portions will be given tax effect, whereas those portions which are without substance will be ignored. Lee v. United States,215 Ct. Cl. 831, 571 F.2d 1180 (1978). See Rothschild v. United States,186 Ct. Cl. 709, 407 F.2d 404 (1969); Goldstein v. Commissioner,364 F.2d at 742; Falsetti v. Commissioner,85 T.C. at 354. Therefore, despite our finding under section 183, we can consider respondent's argument that the promissory note portion of this transaction did not constitute genuine indebtedness. Of particular import in our analysis under this issue is that the "commissions" payable to petitioners under the Letter Agreements exceeded the amount necessary to amortize the promissory notes and make the interest "payments". In fact, petitioners received the excess $82 per month in cash. This arrangement was implemented after Hassell suggested that the franchisees receive a 20% return on their cash down payment. Petitioners reported the total commissions called for in the Letter Agreements *163 as income and deducted the offsetting interest "paid" on the notes. With the exception of the $82 per month excess paid to petitioners in cash, however, these "commissions" and "interest" amounted to nothing more than bookkeeping entries on the books of Alpha Omega. Generally, bookkeeping entries do not constitute "payment" of a deductible expense. Shapiro v. Commissioer,40 T.C. 34, 39 (1963); Lynch v. Commissioner,31 T.C. 990, 996 (1959), affd. 273 F.2d 867 (2d Cir. 1959); Broome v. United States,145 Ct. Cl. 298, 170 F. Supp. 613 (1959); see Pike v. Commissioner,78 T.C. 822, 834, 849-850 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). Under these circumstances, petitioners and Alpha Omega did nothing more than agree to relinquish each other of a promise. [47] See Heyman v. Commissioner,70 T.C. 482 (1978), affd. without published opinion 633 F.2d 215 (6th Cir. 1980), and affd. 652 F.2d 598 (6th Cir. 1980); Cleaver v. Commissioner,6 T.C. 452 (1946), affd. 158 F.2d 342 (7th Cir. 1946), *164 cert. denied 330 U.S. 849 (1947). We considered a similar situation in Estate of Franklin v. Commissioner,64 T.C. 752 (1975), affd. 544 F.2d 1045 (9th Cir. 1976), a case involving a sale-leaseback transaction. In that case, payments due under a sales agreement by the buyer to the seller were offset against rentals due under a lease from the seller to the buyer. Bookkeeping entries were made reflecting these transactions but no cash changed hands. This Court found no economic significance in those bookkeeping entries. 64 T.C. at 764-765. Using this reasoning, we find that petitioners did not pay any interest and, accordingly, we hold that they are not entitled to an interest deduction. Using the same rationale, however, this finding necessitates a corresponding finding that the commissions *165 also were not "paid", except to the extent of the monthly checks received by petitioners. Therefore, petitioners need not report as income that portion of the commissions called for under the Letter Agreements which they did not receive in cash. We now turn our attention to the question with greater tax effect, that is, whether these notes can be added to petitioners' bases for purposes of computing deductions for amortization, depreciation and the investment credit.Petitioners maintain that an examination of their promissory notes should leave no doubt that they constitute genuine indebtedness because they are unconditionally payable for an amount certain, at fixed maturity dates, and the notes provide for collection procedures in the event of default. They argue, therefore, that these notes created a legally binding debtor-creditor relationship between themselves and Alpha Omega which must be taken into account in the computation of basis. Here again, petitioners contend that we should make our determination by looking at the form of the transaction. There is no doubt that the promissory notes, examined alone, reflect a legally binding debtor-creditor relationship and, without *166 more, such an indebtedness would have formed part of petitioners' investments in the property acquired. However, the real import of the transaction must be determined not only on a consideration of one of the written instruments, but on the effect of all of the written instruments on each other, and on all other surrounding circumstances. As the Supreme Court stated, the essence of the arrangement "is determined not by subtleties of draftsmanship but by their total effect." Commissioner v. P.G. Lake, Inc.,356 U.S. 260, 266-267 (1958). Respondent again contends that the promissory notes signed by petitioners do not reflect genuine indebtedness because the parties did not treat them as such.Respondent argues that each petitioner seemed relatively unconcerned about signing notes that were substantial in relation to his or her net worth. Indeed, at least one petitioner admitted to having a net worth below the face amount of the notes. Respondent further argues that, despite its precarious financial position, Alpha Omega never made any genuine collection efforts because its management believed that it would be "morally" wrong to attempt to collect such notes. We *167 have examined the record and have determined that the factual foundation of respondent's arguments is true. [48] Consequently, we find and hold that the parties never intended that these notes would create a genuine debtor-creditor relationship. [49]
However, this finding is not entirely determinative of this issue. In determining the substance of a transaction, we must focus on economic realities and not base our decision solely on the subjective intent of the parties. Denver & Rio Grande Western R.R. Co. v. United States,205 Ct. Cl. 597, 603, 505 F.2d 1266, 1270 (1974); Graf v. Commissioner,80 T.C. 944, 952 (1983); Derr v. Commissioner,77 T.C. 708, 734 (1981). *168 See also Waddell v. Commissioner,86 T.C. 848 (1986). This is not the typical "tax shelter" case where the parties to the transaction use nonrecourse notes whose face amounts greatly exceed the fair market value of the property acquired in order to generate inflated tax deductions and credits. See, e.g., Dean v. Commissioner,83 T.C. 56 (1984); Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Zemel v Commissioner,734 F.2d 9 (3d Cir. 1984), affd. without published opinion sub nom. Rosenblatt v. Commissioner,734 F.2d 7 (3d Cir. 1984), affd. without published opinion sub nom. Krasta v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984); Flowers v. Commissioner,80 T.C. 914 (1983); *169 Narver v. Commissioner,75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); Beck v. Commissioner,74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982).In that genre of cases, the courts readily determined that there was neither an intent to pay the notes on the part of the taxpayer nor any likelihood of the notes ever being paid because the fair market value of the assets securing the loan was substantially less than the face amount of the debt and the creditor had no other source of payment. The question we face here involves recourse notes which could, at least legally, have been enforced against unpledged assets held by petitioners. Even though Alpha Omega felt morally obligated not to enforce the notes, exposure may have resulted had the notes fallen into the hands of third parties, or if Alpha Omega, because of its poor financial condition, had come under the jurisdiction of the bankruptcy court. Therefore, we must examine under what circumstances, if any, recourse notes used to acquire property may be ignored for purposes of determining basis in the acquired property. An analysis of several relevant *170 cases in which recourse indebtedness has been held not to be genuine indebtedness is helpful in this regard. In Houchins v. Commissioner,79 T.C. 570 (1982), the taxpayer used recourse notes to purchase cattle, but the recourse character of the obligations expired two and a half years after the execution of the sales agreement and, by paying certain interest and fees, the taxpayer could avoid paying the principal. The Court found that the taxpayer's personal liability under these circumstances was "illusory", and, therefore, was not intended to secure the payment of the purchase price. 79 T.C. at 600. Accordingly, the deductions claimed by the taxpayer based on this indebtedness were denied. In Graf v. Commissioner,80 T.C. 944 (1983), the notes were payable only out of the profits from the sale of certain ocean-front lots created by dredging services paid for in cash and a promissory note. The Court held that taxpayers' obligation was so "utterly and inherently * * * contingent and speculative that its repayment cannot be predicted with any degree of accuracy." 80 T.C. at 948. Moreover, in Graf, the taxpayers had *171 attempted to draw a distinction between contingency of payment and contingency of obligation, claiming that only the latter affects the status of debt for tax purposes. They argued that the obligation was not subject to reduction, and therefore was not contingent. However, the Court held that an obligation is no less contingent simply because it remains a fixed dollar amount and is not subject to reduction. As we stated, "[s]imply put, if the obligation to pay never arises, the obligation itself is meaningless." 80 T.C. at 949 n. 6. In Herrick v. Commissioner,85 T.C. 237 (1985), the taxpayers acquired a distributorship by making a payment in cash and signing both recourse and nonrecourse notes. They had purchased the distributorship assuming that the system was operational, and intended not to pay the notes until a viable product was furnished.Further, the promoter informed the taxpayers that it was declining to accept payments of the fees represented by the recourse and nonrecourse notes pending satisfactory resolution of the problems inherent in the system's development. The Court found that the obligation to pay the notes never arose and, *172 accordingly, held that the taxpayers were not entitled to any deduction based on their recourse notes. [50]
On the other hand, in Packard v. Commissioner,85 T.C. 397 (1985), this Court held that, where the taxpayer was personally liable on a debt to a third party and payment was not contingent on future profits or any other contingency, a true debt existed. Although the loan was fully collateralized with a certificate of deposit purchased and pledged by the promoter, the loan was a genuine multi-party transaction with economic substance because the taxpayers were liable to pay the face amount of the notes. Further, in Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184 (1983), affd. in part and revd. in part 752 F.2d 89 (4th Cir. 1985), this Court had held that a sale-leaseback transaction was a sham without a business purpose or economic substance and, therefore, both nonrecourse and recourse *173 notes were not genuine indebtedness. [51] The Fourth Circuit agreed that the transaction was a sham. Therefore, it held that the recourse notes could not be taken into account in computing the taxpayer's basis for depreciation. However, the Fourth Circuit allowed the deduction of the interest on the recourse notes. It reasoned that -- [T]he "cash payment" was merely the first installment due on the back-dated note. The other installments were equally genuine obligations notwithstanding they were deferred, and the interest due upon their payment was equally an obligation of economic substance. Rice could no more walk away without liability from the deferred principal and interest obligation than it could walk away from the obligation to pay the first installment. [752 F.2d at 96.] While each of the above cases turned on its facts (as indeed do the instant cases), they do establish that the mere fact that an obligation is recourse on its face, is not determinative. Recourse debt should *174 not be taken into account where, taking economic realities into account, there is no reasonable likelihood that the taxpayer actually will have to pay the debt. As we observed in Bridges v. Commissioner,39 T.C. 1064, 1077 (1963), affd. 325 F.2d 180 (4th Cir. 1963), "[w]hile it is true that technically petitioner was personally obligated on his note * * * there was no reason to think that petitioner could or would have been called upon to pay the note out of his own funds * * *." When a transaction is structured in such a manner, that payment by the taxpayer is not probable, either because of the length or the term of the debt, the source of the payments or any other arrangement which does not provide an economic incentive for the taxpayer to pay the debt, then such debt is not genuine indebtedness to be taken into account for purposes of determining a taxpayer's investment in property. Cf. Burns v. Commissioner,78 T.C. 185 (1982). In determining whether there is a likelihood of repayment, one of the factors the courts have considered is whether the party making the loan ever investigated the financial status and credit worthiness *175 of the obligor. See, e.g., Capek v. Commissioner,86 T.C. 14, 48-49 (1986); Estate of Helliwell v. Commissioners,77 T.C. 964, 976-977, 987-988 (1981).Alpha Omega never obtained any information from its prospective franchisees to ascertain whether they could actually make the payments on their notes. Although each petitioner signed a statement making certain representations concerning his or her net worth and taxable income, this information was insufficient to determine the ability of that individual to come up with the cash. Further, Alpha Omega never verified any of these representations, and with regard to at least one petitioner, the representations were not true. Another aspect that the Courts have looked to is the ability of the obligor to make such payments. See, e.g., Frank Lyon Co. v. United States,435 U.S. 561, 582 n. 17 (1978); Burns v. Commissioner,78 T.C. at 212. All petitioners would have had difficulty actually making the payments called for in the notes, and, in some cases, it would have been virtually impossible. In both Packard v. Commissioner,supra, and Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89 (4th Cir. 1985), *176 the courts found that there was a likelihood of payment. In Packard, petitioner was the actual borrower with substantial income, primarily liable on a recourse debt due to a third party and the debt was likely to be repaid. In Rice's Toyota World, the recourse portion of the obligation was repaid. Consequently, the deduction for interest paid on such loan was allowed. Petitioners rely on Frank Lyon Co. v. United States,supra. In comparing the facts in this case with Lyon, we find countless differences. For instance, in Lyon, the transaction was framed by regulatory requirements, there were bona fide financial negotiations between the parties, the financing was obtained from a third party,[52] and the taxpayer's net worth was sufficiently substantial to make collection of the debt probable regardless of the prudence of the investment. Here, the transaction was not dictated by regulatory requirements, the terms of the transaction were not negotiated, but were sold as a package deal, the indebtedness was to the seller and not to a third party, and the petitioners' financial resources were not substantial when compared with the face amounts *177 of the notes. To hold under these circumstances that the legal liability called for in petitioners' promissory notes was bona fide would exalt form over substance. [53] Accordingly, based on the totality of the record herein, we hold that the liabilities evidenced by petitioners' promissory notes did not reflect the economic substance of this transaction, and therefore, did not represent an investment in the franchise and video system that would be subject to amorization, depreciation or the investment credit. [54]
Issue No. 4 Depreciation and Investment Credit on Video System Respondent also maintains *178 that petitioners are not entitled to deduct depreciation or claim investment credit on their video systems because the equipment was not placed in service during the years in issue, nor were the films primarily educational or entertaining in nature as required by section 1.48-8(a)(3) and (5) of the Income Tax Regulations. We find that depreciation deductions and investment credits on the video systems are not allowable to petitioners, but on different grounds. To compute the amount of investment credit or depreciation deductions allowable to petitioners, we must first determine their basis in the video system. [55] The burden to show basis which would give rise to such credit or deduction is on petitioners. Interstate Transit Lines v. Commissioner,319 U.S. 590 (1943); New Colonial Ice Co. v. Helvering,292 U.S. 435 (1934); Welch v. Helvering,290 U.S. 111 (1933). *179 Petitioners maintain that the documents reflect their basis; that they purchased the video system for over $18,000 [56] by making a cash down payment and executing a promissory note. [57] Petitioners contend that, since they willingly contracted for their video systems, and since they dealt with Alpha Omega at arm's length, that the stated purchase price is their basis. Generally, the purchase price determined by unrelated parties in arm's length dealings constitutes the basis of the property for purposes of computing depreciation and the investment credit. Secs. 46(c), 167(g), 1011, 1012. However, in making our determination, we again cannot blindly accept the form in which the transaction was *180 cast. We must look at the economic substance of this transaction to determine if the documents reflect such substance. Commissioner v. Tower,327 U.S. 280, 291 (1946); Gregory v. Helvering,293 U.S. 465 (1935). In other words, we must determine whether the purchase price as reflected in the documents accurately reflects the fair market value of the equipment purchased. Fair market value has been defined as the price that would be agreed upon by a willing buyer and a willing seller, after negotiations for sale, neither being under any compulsion to deal, and both having reasonable knowledge of all relevant facts. United States v. Cartwright,411 U.S. 546, 551 (1973); McShain v. Commissioner,71 T.C. 998, 1004 (1979). Petitioners maintain that the amount they "paid" for the video system is the best measure of the fair market of such system. Generally, a current transaction resulting from bona fide negotiations between buyer and seller is the best measure of fair market value. Cf. Abramson v. Commissioner,86 T.C. 360 (1986); Lio v. Commissioner,85 T.C. 56, 65-66 (1985); Chiu v. Commissioner,84 T.C. 722 (1985). *181 However, the record is clear that petitioners did not separately evaluate the value of the video system in their dealings with Alpha Omega. In fact, none of them even saw the video system before entering into the transaction. Further, all of the petitioners testified that they looked upon the video system as part of the franchise package. Because they could not acquire their franchises without paying the entire asking price, they evaluated the risk based on their entire investment, without segregating such cost into separate components. Therefore, there was no arm's-length dealing for the video system alone. Further, as noted earlier, the video system was substantially "paid" for by bookkeeping entries on the part of Alpha Omega. Under similar circumstances, this Court has found the stated purchase price "meaningless." Estate of Franklin v. Commissioner,64 T.C. 752, 765 (1975), affd. 544 F.2d 1045 (9th Cir. 1976). Expert testimony presented by respondent has convinced us that the value of the projector and film strip, which comprised the video system, was substantially less than the $18,000 plus value claimed by petitioners. In fact, without *182 the franchise, it had only nominal value. Petitioners did not present any independent expert valuation testimony in this regard. Consequently, we find that petitioners have not shown that the price stated in the documents constitutes their actual investment in the video system. Further, we conclude that petitioners have failed to carry their burden of proving the portion of their costs which are allocable to the video systems. Consequently, we hold that no depreciation deductions or investment credits on the video system are allowable. [58]Uecker v. Commissioner,81 T.C. 983, 992, 998 (1983), affd. per curiam on other issues 766 F.2d 909 (5th Cir. 1985). Because of the above holding, we need not consider respondent's other arguments with respect to this issue. Conclusion Based on our holdings, arrived at in the context of these particular facts and circumstances, we hold that the petitioners' Alpha Omega franchises constituted activities entered into for profit, and consequently, *183 petitioners must report all income derived therefrom and may deduct all of their ordinary and necessary business expenses (including those in excess of income) in connection therewith. However, because we have found that the promissory notes do not constitute genuine indebtedness, petitioners are not to include in income amounts derived from the Letter Agreements to the extent that they were not received in cash and were offset against purported interest and note payments, nor are they to take into account any portion of the notes for purposes of computing amortization deductions in respect of their franchises. Further, we hold that petitioners are not entitled to an interest deduction because no interest was ever paid. In addition, petitioners are not entitled to any investment credit or depreciation deductions on their video systems. Decisions will be entered under Rule 155.
Footnotes
1. The following cases are consolidated herewith: Margaret L. Roe, docket Nos. 9918-83 and 17978-84; Michael L. and Patricia A. Sincleair, docket No. 20902-83; Louis L. Young, docket No. 416-84; and James and Teelaine Harvey, docket No. 2364-84. These cases were chosen by the parties as representative of approximately forty other cases filed by other petitioners who participated in similar transactions with Alpha Omega Publications.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. All of the petitioners have surrendered their franchises.↩
4. The name of this corporation was later changed to Alpha Omega Publications, Inc. For purposes of clarity and continuity, this corporation will be referred to as "Alpha Omega", both before and after the name change. ↩
5. The eight consultants were all highly regarded educators in the fields of elementary education, English, science education, language arts, and social studies.↩
6. Two major evaluations of the LIFEPACs have been conducted since the inception of the program, one in 1980 and another in 1983. To conduct these evaluations, Alpha Omega hired individuals, experts in their respective fields, who reviewed the educational quality of the LIFEPACs assigned to them. To get feedback from teachers and administrators, Alpha Omega established a nationwide toll-free "800 number" where errors and inconsistencies found as a result of working with the LIFEPACs were logged. In addition, accompanying each shipment was a form in which all errors, inconsistencies and suggestions could be listed by the recipient. When these forms were returned, they were logged, evaluated and all suggestions were taken into consideration in evaluating the program.↩
7. Alpha Omega's Operations were patterned after its chief competitor, a company named Accelerated Christian Education (hereinafter "ACE") founded and promoted by Dr. Donald R. Howard. Dr. Howard, who had been a teacher, principal and pastor, began promoting the Christian school movement in 1970 by running training sessions on how to start Christian schools. By the fall of 1971, he had started nine such schools. By 1973, there were 330 schools started. By 1977, the number of schools started had risen to 1,900 and has since been progressing at the rate of approximately 500 schools per year. At the time of trial, ACE had over 6,000 schools purchasing its materials and was grossing approximately $15 million in sales. In the summer of 1973, ACE hired Dr. Moore (who later founded Alpha Omega) to edit the first and second editions of its curriculum. Another principal of Alpha Omega, Mr. J. Richard Fugate, had been ACE's business manager for about 2 years.↩
8. At trial, respondent moved to introduce into evidence certain documents evidencing the criminal conviction of John W. Duffell, III (hereinafter "Duffell") of various counts of fraud. Petitioners objected and we deferred ruling on the motion. Duffell had recommended the franchise plan to two Board members of Alpha Omega, Melvin R. Hassell (hereinafter "Hassell") and J. Richard Fugate (hereinafter "Fugate"). In addition, after Board approval of the plan, Duffell drafted at least part of the 1979 Offering Circular (see infra, p. 10). Duffell was not an employee, officer or director of Alpha Omega, nor a franchisee or a witness at trial. Further, there is no indication that any of the criminal acts mentioned in respondent's documents relate to transactions involving either Alpha Omega or any of the petitioners. Respondent makes two arguments for the admission of Duffell's criminal convictions. First, he contends that it is relevant to show that Alpha Omega never intended its franchise programs to be profitable and is therefore admissible under Fed. R. Evid. 404(b). Even if admitted, we fail to see how these documents would prove such an intent on the part of Alpha Omega. In any event, it is each petitioner's intent and not that of Duffell or Alpha Omega that we have in issue under sec. 183. Respondent proffered no evidence showing that Duffell had any direct influence or contact with petitioners. See United States v. Romo,669 F.2d 285, 288 (5th Cir. 1982). Therefore, we find these documents are not admissible to show intent. Second, respondent argues that Duffell had made certain statements, both written and oral, which are in evidence and that Duffell's convictions are admissible to attack the truthfulness of these statements. Fed. R. Evid. 806 allows a party to attack the credibility of the declarant of a hearsay statement as though that person had actually testified. However, hearsay is defined as "a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. r. Evid. 801(c). Further, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c), Advisory Committee notes. We have examined the testimony and documents to which respondent refers. Duffell's statements are relevant to our determination only because these statements were in fact made. In no instance are we requested to accept Duffell's statements as true. Therefore, these statements are not hearsay. Accordingly, respondent's motion is denied.↩
9. This number was arrived at by taking a total of 165,000 churches in the whole of the United States and dividing by 500. Alpha Omega never determined the actual number of churches in any particular territory. ↩
10. Hassell, an investment advisor as well as an Alpha Omega Board member, sold 423 of the 437 franchises. A $750 commission was paid on each franchise sold.↩
11. The "video system" consisted of an 8mm film strip and film projector. ↩
12. The documents refer to a "license" and the testimony at trial used both of the terms "license" and "franchise." The words "franchise" and "license" as well as "franchisee" and "licensee" are used synonymously in this opinion. ↩
13. The listed principals were: Rudolph Moore, Ph.D, President and Director; Clarence Engel Brenneman, Chairman of the Board and Director; Melvin R. Hassell, Director; Charles Collings, Director; Gary Brown, Director; Dick Brooks, Director; Rick Fugate, Executive Vice-President. Also included were brief biographies of each of these principals. All were highly educated and had extensive experience in the areas of Education, Business Administration, Christian Ministry, Advertising, Tax, Investment Planning, and Finance. ↩
14. A few of the transactions herein arose from franchises sold in 1978. Although the record is not clear, we think it a reasonable inference that the 1978 franchisees were provided with substantially the same information as that contained in the 1979 Offering Circular.↩
15. Promissory notes issued in 1978 were nonrecourse notes.↩
16. Alpha Omega made the film to educate the Christian community on the need for Christian schools. An interview format was used featuring the major principals of Alpha Omega. Alpha Omega hired a professional film company to perform the actual filming. ↩
17. Prior to January 1, 1979, the video system note was due in equal monthly installments of $264.13. The note provided that in the event of a default the holder could encumber or repossess the video system but could not maintain any action against the franchisee for any deficiency.↩
18. With the 1979 Offering Circular, each petitioner received a warning that any information or representation not contained within the offering circular should not be relied on by the franchisee. The prospective franchisee was further advised to obtain legal, business or tax advice if he was not personally able to evaluate the transaction.↩
19. No mention of this agreement was contained in the 1979 Offering Circular. It was recommended by Hassell, who felt that a 20 percent cash flow was appropriate for this type of investment. However, in anticipation of possible financial problems, Alpha Omega inserted a thirty (30) day cancellation clause in all of the Letter Agreements signed after December 31, 1978. ↩
20. Letter Agreements dated prior to January 1, 1979 called for a payment of $1,060,30 per month. ↩
21. For Letter Agreements signed after December 31, 1978, the amount offset against the fixed payment of $1,165 was $1,083. The amount of the offset was designed to pay off, in equal monthly installments, both the franchise and the video system in five years. This offset was presumed despite the fact that the franchise note called for monthly payments of the greater of 5 percent of the total commission due from the sale of LIFEPACs or $100. The $1,083 offset was greater than the payments required by the note for all petitioners for all years in issue. ↩
22. Letter Agreements signed prior to January 1, 1979 did not contain this cancellation clause. However, they were terminable in case of default by the franchisee. Only 60 franchises were sold in 1978.↩
23. Those individuals were: Dr. Raymond Miller of Napa, California; Dr. Ronald Boys of Indianapolis, Indiana; and Pastor John Parton of Murfreesboro, Tennessee.↩
24. In fact, none of the petitioners ever received or viewed the video systems until after the franchises were terminated.↩
25. The evidence at trial indicated that a total of 437 franchises were sold.↩
26. As explained earlier, this corporation was the successor, after a name change, of Educational Media Corporation. ↩
27. According to the AOP Offering Circular, the 56,000 shares to be distributed were acquired by Alpha Omega as a result of the following transactions. In 1977, 10,000 shares of Educational Media Corporation common stock were sold to ten persons for $1 per share. In 1978, 3,333 shares of common stock were sold to five persons for $15 per share. In 1980 and 1981, 2,003 shares of common stock were sold to three persons for $30 per share. In February 1982, the stockholders reallocated their shares so that the ten original shareholders retained their 10,000 shares, the five shareholders who acquired shares in 1978 received 10,000 shares, and the three shareholders who acquired shares in 1980 and 1981 received 9,000 shares. The company then re-acquired 1,000 shares (apparently eliminating one shareholder). It then declared a two share stock dividend on the remaining 28,000 shares so that 84,000 shares of the common stock were then issued and outstanding.On June 20, 1982, the 46 limited partners of AOP I and AOP II exchanged their limited partnership interest for 102,667 shares. Alpha Omega then had a total of 51 shareholders with 186,667 shares. The original 17 shareholders agreed to give up to a maximum of 56,000 shares, equal to 30 percent of the total outstanding shares, to those franchisees who agreed to accept such stock instead of the installment payments called for in the franchise termination agreement.↩
28. Petitioner James Harvey used the same CPA as petitioner Michael L. Sincleair.↩
29. Petitioners originally alleged that the notice of deficiency sent to them was untimely because it was not sent prior to the expiration of the three year period for assessment under sec. 6501(a). This issue was conceded by petitioners in the Stipulation of Facts submitted at trial.↩
30. The CPA who investigated the actual operations of Alpha Omega for the Memorex group became involved with the Alpha Omega franchises through Hassell. (See fn. 10, supra.) Hassell had sold a mutual client some investments, primarily cable television, which seemed to be working well. Later Hassell became his client. Upon arrival in Arizona, the CPA was driven to Alpha Omega's office and warehouse by Hassell.He spent about two hours at the warehouse and office inspecting the operations. He viewed artists designing workbooks and doing pasteups; the computer operation; and the warehouse with inventory being boxed and shipped. At that time, Alpha Omega employed approximately 15 persons. He obtained samples of several of the LIFEPACs; copies of order blanks for elementary and secondary schools, and some literature published by Alpha Omega. After the visit, he advised the Memorex group that Alpha Omega was a viable business with a reasonable chance of succeeding. He viewed the investment as one worth $5,000, which carried with it certain tax advantages, but which had very little financial exposure inasmuch as he believed that the Letter Agreements would return the initial investment to the franchisees.↩
31. Although petitioner filed a joint return for 1978, his spouse did not join him in filing a petition in this Court.↩
32. Much of the evidence submitted at trial concerned the objectives sought by Alpha Omega in promoting the franchise program. Respondent contends that, because Alpha Omega offered the franchises strictly as a vehicle to raise capital for its operations and because it never intended that the franchisee realize a profit, that there was no profit objective under section 183. However, our determination under sec. 183(a) must be made at the individual level. Consequently, we consider Alpha Omega's objectives under this issue only insofar as they may cast light on the objectives of the petitioners.↩
33. In fact, one petitioner could not even recite the location of all of his territories at the time of trial. See p. 31, supra.↩
34. For franchises sold after December 31, 1978, payments totalling $64,957.90 would have liquidated the franchise and video system notes, including interest, at the end of the five year period when the notes matured. Adding the $5,000 cash down payment the total becomes $69,957.90. The payments under the Letter Agreements for the same 60 months aggregated $69,900. For franchises sold prior to January 1, 1979, the amounts were $58,620.00, $63,620.00 and $63,618.00, respectively. See pp. 16-18, supra.↩
35. Petitioners point out that, because of the offset in the Letter Agreements, Alpha Omega had credited substantially more against the notes than would have been required during the entire term before maturity, and that, therefore, no collection action was warranted before January 1, 1985. We discount this argument because the balance due could have been accelerated if the franchisees had defaulted in their duties under the franchise agreement or any other agreement. After termination of the sales representatives, technically the franchisees were in default of their duties under the Letter Agreements because they failed (either personally or through sales representatives) to mail advertising or perform other required duties. Further, the two lawsuits filed by Alpha Omega prior to January 1985 did allege delinquencies.↩
36. Some petitioners requested franchises located in the "Bible Belt", believing that sales in that area would exceed those in other areas of the country.↩
37. If bonus depreciation was not claimed, the tax benefits were projected to last two years. ↩
38. Compare Beck v. Commissioner,85 T.C. 557, 575 (1985), where the taxpayer's investment could only be explained by tax motivations, with Estate of Thomas v. Commissioner,84 T.C. 412, 438↩ (1985), where the Court determined that the taxpayers did not enter into the transaction primarily for tax benefits.
39. Since petitioners had no intention of actively participating in operating their franchises, it follows that petitioners were not seeking personal pleasure or recreation from these activities. The Regulations acknowledge that participation in an activity which lacks any appeal other than profit is indicative of a profit objective. Sec. 1.183-2(b)(9), Income Tax Regs.; Lemmen v. Commissioner,77 T.C. 1326, 1341↩ (1981).
40. The arithmetic works out as follows: each petitioner made an initial cash investment of $5,000; the Letter Agreements signed in 1979 and later years called for monthly commissions of $1,165; after deducting the promissory note payments (as amortized over 60 months) of $1,083, petitioners were to receive $82 per month. Over 60 months, this would have totaled $4,920. For Letter Agreements signed in 1978, the amounts were $1,060, $977, $83 and $4,980, respectively. See also footnote 34, supra.↩
41. Letter Agreements signed after December 31, 1978 were cancellable on 30-days notice. Letter Agreements signed prior to January 1, 1979 could only be terminated if the franchisee was "in default." Technically, petitioners were in default after the sales representatives were terminated in October 1980 because no one was performing the duties required under the Letter Agreements. ↩
42. We recognize that we did not consider the effect of the cancellation provision in deciding Issue No. 1. However, the objectives of the petitioners were at issue in that determination. Because none of the petitioners believed that the Letter Agreements would be cancelled, they planned on collecting the amounts due for the entire 60 months and their objectives as to the transaction were formulated thereby. Our focus under this issue is different. Here, respondent contends that the economic substance of the transaction was a loan. We can only determine that by analyzing the business realities underlying the transaction and the resulting economic and legal consequences to both parties. See Frank Lyon Co. v. United States,435 U.S. 561 (1978); Gilbert v. Commissioner,74 T.C. 60, 66↩ (1980).
43. In each of the many cases considering the tax ramifications of non-interest bearing loans, there has always been some type of relationship between the borrower and lender which would indicate the motivation behind the loan. E.g., Dickman v. Commissioner,465 U.S. 330 (1984); Johnson v. United States,254 F. Supp. 73 (N.D. Tex. 1966), (parent to child); Crown v. Commissioner,67 T.C. 1060 (1977), affd. 585 F.2d 234 (7th Cir. 1978) (grantor to trust); Hardee v. United States,708 F.2d 661 (Fed. Cir. 1983); Parks v. Commissioner,686 F.2d 408 (6th Cir. 1982), affg. a Memorandum Opinion of this Court (corporation to shareholder); Joseph Lupowitz Sons, Inc. v. Commissioner,497 F.2d 862↩ (3d Cir. 1974), affg. in part a Memorandum Opinion of this Court (related corporations).
44. This Court has recognized that the privilege of using property without charge may be a charitable contribution.See Thriftimart, Inc. v. Commissioner,59 T.C. 598, 615 (1973), remanded on other issues by Order (9th Cir. 1975); Allen v. Commissioner,57 T.C. 12, 13 (1971); Sullivan v. Commissioner,16 T.C. 228, 231↩ (1951).
45. The word "property" includes intangible property. Computing & Software, Inc. v. Commissioner,64 T.C. 223, 231-232↩ (1975).
46. Where a transaction is a sham, the labels are ignored and the transaction is taxed according to its substance. Rice's Toyota World, Inc. v. Commissioner,752 F.2d 89, 95 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243↩ (1981).
47. Even an exchange of checks would not have constituted payment. See Battelstein v. Commissioner,631 F.2d 1182, 1183 (5th Cir. 1980), cert. denied 451 U.S. 938 (1981); Benningfield v. Commissioner,81 T.C. 408, 421-422 (1983); Menz v. Commissioner,80 T.C. 1174↩ (1983).
48. Such findings were critical to our determination under section 183. ↩
49. Even if petitioners had a good faith belief that an indebtedness existed, this does not dictate our conclusion under this issue. Lynch v. Commissioner,273 F.2d 867, 872 (2d Cir. 1959), affg. 31 T.C. 990 (1959); Karme v. Commissioner,73 T.C. 1163, 1194 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); Derr v. Commissioner,77 T.C. 708, 734↩ (1981).
50. Having decided the distributorship was not an activity entered into for profit, the Court's consideration of the recourse notes was limited to determining the amount of interest deductible under sec. 163. 85 T.C. at 258↩.
51. Recourse notes were also involved in a transaction held to be a sham in Moore v. Commissioner,85 T.C. 72↩ (1985), on appeal (9th Cir., Oct. 22, 1985).
52. See Hilton v. Commissioner,74 T.C. 305, 361-363 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982); see also Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 203-204↩ (1983).
53. Although we have directed our discussion under this issue to petitioners' recourse notes, our reasoning and findings apply equally to the nonrecourse notes issued prior to January 1, 1979. ↩
54. Because we have decided that these notes do not reflect genuine indebtedness, we need not consider respondent's arguments under section 465.↩
55. An investment credit is allowable to taxpayers who purchase tangible personal property to be used in a trade or business or for the production of income. Secs. 38 and 46. The amount of the credit is based upon the taxpayers' qualified investment in the property. Sec. 46(a) and (c). "Qualified investment" means the applicable percentage (as set out in section 46(c)(2)) of the basis of such property. Sec. 46(c); sec. 1.46-3(a)(1), Income Tax Regs. Similarly, depreciation is deductible by the purchaser of property used in a trade or business or for the production of income. Sec. 167(a); Pike v. Commissioner,78 T.C. 822, 841-842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). It also is computed using the taxpayers' basis in the property. Sec. 167(g); sec. 1.167(a)-1(a), Income Tax Regs.↩
56. The petitioners claimed varying amounts of investment credit and depreciation on their respective returns. However, as to all petitioners, Alpha Omega viewed the transaction as the sale of a video system for a cash down payment of $1,000 plus a note principal of $17,750, a total purchase price of $18,750. ↩
57. We already have found that these notes do not reflect a genuine indebtedness and, therefore, may not be added to petitioners' bases for depreciation or investment credit.↩
58. Since none of the amounts paid by petitioners have been allocated to the video system, the $1,000 cash payment should be added to the cost of the franchise.↩